IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SAMUEL STOCK, JR.,

       Plaintiff,

v.                                                                    CIV 04-31 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.

# MEMORANDUM OPINION AND ORDER

      Plaintiff Samuel Stock, Jr. ("Stock"), was born on April 21, 1970. He obtained a GED and completed one year of technical college in 1991 at age twenty. *See, e.g., Administrative Record* ("*Record*") at 19, 45, 63, 123, 144. He worked at various jobs until age thirty, when he quit because his back pain "was so bad, [he] really couldn't get up [out of bed] and go to work." *Id.* at 47. In March 2001, Stock applied for benefits alleging onset as of February 18, 2001, due to back pain and weakness in his legs and arms. *Id.* at 20, 123-27, 138.

      At the first hearing, Plaintiff's counsel requested Administrative Law Judge ("ALJ") David R. Wurm to send Plaintiff for a psychological evaluation, and the request was granted. Dr. Steven Sacks examined Plaintiff in September 2002 and issued his report. *See id.* at 39, 44, 299. Thereafter, ALJ Wurm issued his first opinion, finding Plaintiff has the residual functional capacity to perform a wide range of light work, and consequently Plaintiff was not disabled under the Medical-Vocational Rules. *See id.* at 91. Counsel then requested that ALJ Wurm reopen the proceedings because she had not received a copy of Dr. Sack's evaluation. She further requested that ALJ Wurm call a vocational expert based on the findings in Dr. Sack's evaluation. *See Doc.*

*12,* Exh. A. ALJ Wurm granted the request. *Record* at 114.

After holding another hearing at which a vocational expert testified, ALJ Wurm issued a second decision. He again found that Plaintiff has the residual functional capacity for a wide range of light work, but with the limitations of "occasional postural movements such as bending and stooping and [work] that avoids stress." *Id.* at 22. Based on the testimony of the vocational expert, ALJ Wurm found that Plaintiff could perform work as a laundry folder, advertising distributor, or shipping and receiving weigher. *See id.* at 23. After reviewing additional evidence, the Appeals Council declined review on December 9, 2003, thereby rendering the ALJ's decision final. *See id.* at 5; *see also id.* (index listing date of decision).

This matter is before the court on Plaintiff's motion where he asserts that ALJ Wurm erred in identifying Plaintiff's psychological limitations and in the assessment of Plaintiff's credibility. Plaintiff asks the Court to remand for a rehearing. *See Doc. 12.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. See *Docs. 3, 5.* Having read and carefully considered the entire record, I find that Plaintiff's motion should be granted and the matter remanded to the Commissioner for further proceedings.

## II. Factual Background

### A. *1994 Automobile Accident*

Plaintiff was involved in a motor vehicle accident on May 23, 1994, but the record does not reveal details of the accident or injuries he sustained. *See Record* at 73, 138. Stock later told his doctors that his back pain started soon after the accident and that he underwent a course of physical therapy but quit because the therapy was not helping. *See, e.g., id.* at 259, 278, 299.

At the time of the 1994 accident, Stock was working in construction as an iron worker. *See id.* at 157, 301. The record is somewhat inconsistent concerning the timing of Plaintiff's work after the accident. *Compare id.* at 157, *with id.* at 301. According to what Plaintiff related to Dr. Sacks, he returned to work in November 1994, some six months after the accident, as a "bouncer" or doorman. Although Plaintiff changed jobs several times between 1994 and when he began working at his last job, he did not leave any of those interim positions because of back pain. *See id.* at 301.

### B. Complaints Of Worsening Back Pain Commencing In 2001

Plaintiff visited the emergency room[1] on New Year's Day 2001, complaining of back pain that had been progressively getting worse for the previous two months, leg weakness, and insomnia. *See id.* at 223-225. Two weeks later, Plaintiff visited the emergency room again, this time complaining that he had twisted his shoulder at work. *Id.* at 198. On both occasions, Stock was treated with medication – Vicodin and Flexeril for his back, and ibuprofen for his shoulder. *See id.* at 198, 224-26.

The MRI taken of his back taken shortly thereafter revealed that

> [t]he vertebral body alignment and marrow signal are normal. There is mild degenerative loss of disc signal at T12/L1 and L5/S1. The remainder of the visualized discs appear unremarkable. There is a mild disc bulge at T12/L1 and L5/S1. No annular tears are identified. There is no evidence of central spinal canal stenosis. There may be mild narrowing of the inferomedial aspect of the left L5/S1 neural foramen. The remainder of the neural foramina are all patent. Moderate facet and ligamentum flavum hypertrophy is noted at L4/L5 and L5/S1.

---

[1] All of the treating medical records in the file are from the University of New Mexico, University Hospital.

> IMPRESSION:
> 1) Mild degenerative changes in the lumbar spine with no significant neural foraminal narrowing or central spinal canal stenosis.
> 2) Mild degenerative loss of disc signal and disc bulge at T12/L1 and L5/S1.
> 3) Moderate facet and ligamentum flavum hypertrophy at L4/5 and L5/S1.

*Record* at 214-15 (duplicate at 275-77).

Plaintiff was referred to physical therapy for his back in March 2001. *See id.* at 212. By May 2001, Plaintiff related that he was "unhappy" with physical therapy and needed medication for his pain and insomnia. Stock was referred to the Pain Management Clinic ("PMC") at that time. *Id.* at 207. A few days later, he was back in the emergency room complaining of a wrist sprain suffered after a slip in the shower that he apparently suffered the same day he was referred to the PMC. *See id.* at 202-04. Soon thereafter, Plaintiff submitted a second physical daily activities questionnaire, indicating a deterioration in his abilities. *Compare id.* at 147-50, *with id.* at 151-56.

### C. Therapist Referral In September/November 2001

Although he was referred to the PMC in May, there are no records of any visit by Plaintiff until August. *See id.* at 196. At that visit Stock was instructed to lose thirty to forty pounds and increase his activity as tolerated. *Id.* at 196. At a visit with "psychology" the following month, Plaintiff denied any problems with depression or anxiety related to his pain. The therapist discussed with Plaintiff the "importance of developing an approach to his pain management" that included the recommended physical exercise as well as consulting with the Division of Vocational Rehabilitation ("DVR") and engaging in meditation and focus awareness exercises. *Id.* at 278. In

addition to the above recommendations, the therapist also requested that Plaintiff read a certain book and call the therapist if he wanted to begin coping skills training. *Id.*

Approximately six weeks later, which was about two weeks after the initial denial of his claim, Plaintiff saw the therapist again. Stock had undergone trigger point injections that day, but had made no effort to read the book or contact DVR, nor had he expressed an interest in the coping skills training that had been offered. *See id.* at 82, 279. He related to the therapist that he is required to do "significant" amounts of driving in taking his wife and stepchildren to and from work and school, and that the driving worsens his pain. He also indicated that trigger point injections did not provide relief. *Id.* at 279. The therapist again "gave pt. my card with a # to call if pt. wishes to follow-up for coping skills training." *Id.* However, this second visit to the therapist on November 2, 2001, marks the last time Plaintiff saw a treating source for psychological aspects of his condition.

Later that month. Plaintiff submitted a new report in conjunction with a request for reconsideration of the decision to deny disability benefits. This report listed even more disabling conditions (arthritis, problems remembering, heart murmur), and a further deterioration of abilities. For example, he asserted that he could no longer drive the children to school, dress himself, get out of the bed or bath unassisted, or open his medication bottles. *See id.* at 169-72. Two weeks after filing this report, Plaintiff visited the emergency room complaining of dizziness with black outs for the past two days. *See id.* at 193.

### D. Treating Pain Physician Dr. Whalen's Findings

Over the next eight months, Plaintiff began to see Dr. Thomas Whalen at the PMC on a regular basis. Dr. Whalen's transcribed notes of each of these visits referred to Plaintiff's obesity.

5

In addition to the trigger point injections, Dr. Whalen also provided Plaintiff "Prolo therapy" and lumbar facet injections. He also temporarily substituted opiates in addition to other medications Plaintiff was taking, which included a muscle relaxer and a pain reliever. Dr. Whalen further prescribed dietary supplements and physical therapy. According to Plaintiff, however, none of these strategies alleviated the pain. Stock told Dr. Whalen that his pain level remained chronic and at a level of 8 or 9 out of a possible 10, regardless of which drugs he was taking or which therapeutic intervention he had undergone. In fact, Plaintiff claimed that each of the therapeutic interventions actually made his pain worse. *See id.* at 246-47, 250-51, 255-56, 266-67, 288-89.

### *1. Plaintiff's Perceived Lack of Cooperation*

Dr. Whalen's found Plaintiff resistant to cooperating with the physical examinations or initiating his own treatment. That is entirely consistent with the psychology department notes from Plaintiff's second and last visit. Furthermore, the physical therapist to whom Dr. Whalen referred Plaintiff during this course of pain management therapy made a similar observation.[2]

For example, at the first of these several visits, Dr. Whalen found it difficult to conduct an examination. Plaintiff professed that he could not perform certain requested maneuvers, and "questioned the reasons for needing" to do those tests. *Id.* at 266. Plaintiff grimaced as he rose from the chair and claimed he could not walk heel to toe. Dr. Whalen encouraged him, however, Plaintiff did so "very easily." He could also squat. *Id.* As for the suggestion of "Prolo therapy," the doctor wanted Plaintiff to investigate it and make the decision of whether to commence "this

---

[2] The therapist recommended that Plaintiff establish a home exercise program rather than physical therapy because of the "tremendous . . . emotional overlay that seem to have affected every area of this patient's existence. He has not responded to any form of conservative intervention in the past and at 8 years post-injury, there is no indication during today's assessment that physical therapy intervention will significantly improve his status." *Record* at 260.

positive course of action. . . ." *Id.* at 267.  Dr. Whalen felt that there was "a great deal of passive aggressive behavior here and I would rather that he initiate a treatment rather than having the treatment brought to him." *Id.*

At the next visit, Plaintiff also claimed that he could not walk heel toe, but Dr. Whalen observed him doing so when Plaintiff went to get on the bed.  He also found Plaintiff's deep tendon reflexes to be a 2+, but he indicated that result reflected Plaintiff's resistance to testing. *Id.* at 288.  At another visit, Dr. Whalen observed that Plaintiff was in "no significant distress" while sitting with his wife, but that he grimaced and walked contorted when "asked to make almost any movement." *Id.* at 250.

   *2. Complaints of Weakness in Upper Body and Shoulder*

Plaintiff complained of weakness in his shoulder, but Dr. Whalen found no relationship between the complaint and Plaintiff's muscle strength.  Dr. Whalen attributed the alleged weakness "entirely on the basis of lack of effort." *Id.* at 251.  Subsequent x-rays of the shoulder revealed no evidence of a fracture, past or present. *Id.* at 293.  When Plaintiff again complained of upper body weakness at yet another visit, Dr. Whalen considered the claim to be "completely nonphysiological." *Id.* at 246; *see also id.* at 250.

   *3. Complaints of Lower Body Pain*

Based on the MRI from January 2001, Dr. Whalen thought "[i]t seems that there is a component of lumbar facet arthropathy contributing to his pain."  Ultimately, however, he concluded that therapy should be discontinued because Plaintiff's "chronic low back pain with minimal subjective findings other than decreased range of motion [and Plaintiff had not responded] to three different intervention techniques."  Although Dr. Whalen used the term

"subjective minimal findings," in context, he plainly meant "objective" findings. For example, the findings throughout Dr. Whalen's reports are that, although he found tenderness to palpation, he also found: Plaintiff's lower strength to be a 5/5; his straight leg raises negative; he was able to walk heal to toe; his low back flexion was 45 degrees; his low back extension usually was 5 degrees, but "greatly improved" after facet injections; his lower reflexes either "normal" or underactive; and the "Patrick's" test was negative. *See id.* at 246, 250, 255, 266, 288.

*4. Suspected Psychological Component to Complaints of Pain*

Dr. Whalen repeatedly suspected that there was a "significant psychological component" to Plaintiff's complaints of pain. *E.g., id.* at 250. In his last report dated June 2002, Dr. Whalen suggested that "it might be appropriate for a referral to Neurology to have their opinion that this is nonphysiological weakness and we will proceed with appropriate psychological counseling." *Id.* at 247. Indeed, subsequent neurological tests – nerve conduction studies, an MRI, x-rays of the spine and chest, and a colonoscopy – all were normal. *See id.* at 306-13, 314-16, 325-26.

Although Plaintiff was taking an antidepressant before he began treatment at PMC, apparently his treating physician Dr. Lehman had prescribed that medication as a sedative rather than for treatment for a mental condition. *See id.* at 155, 174-76, 179. There is no indication that Plaintiff was ever referred for psychological treatment other than his two visits the prior year with the UNM psychology department. Also, nothing in the record indicates that Plaintiff sought psychological treatment outside of UNM. The only other psychiatric examination or therapy Plaintiff received was a single visit to consulting psychiatrist Steven Sacks whose findings are discussed below.

*E. Consulting Psychiatrist Dr. Sacks' Findings*

Dr. Sacks saw Plaintiff in September 2002, for the purpose of assessing

> possible psychiatric impairment and subsequent restrictions in activity. I was also asked to comment on this claimant's effort and cooperation with the evaluation and how it affects the validity of the testing/mental status.

*Id.* at 299. He found Plaintiff "fully cooperative" and did not otherwise comment on the validity of his observations or conclusions. *See id.* at 301. Indeed, Dr. Sacks did not administer any standardized tests such as an Minnesota Multiphasic Personality Inventory ("MMPI"). Instead, Dr. Sacks simply talked to Plaintiff.

Dr. Sacks noted that he was unable to substantiate Plaintiff's assertion that he had not used alcohol or cocaine in the past year. The physician found Plaintiff to be depressed and concluded that he suffers from a "dysthymic disorder secondary to his orthopedic problems." *Id.* at 303. Dr. Sacks also found that Plaintiff "did not meet criteria for somatization disorder" and that it was doubtful that Plaintiff meets the criteria for "convulsion disorder."[3] *Id.* at 304.

I presume that when Dr. Sacks referred to a failure to meet "criteria" that he was

---

[3] As defined by the DSM-IV, the essential features of a "dysthymic disorder" are (1) "[d]epressed mood for most of the day, for more days than not, as indicated by either subjective account or observation by others, for at least 2 years;" (2) that is "not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication);" and (3) accompanied by symptoms affecting two or more things such as appetite, sleeping, fatigue, self-esteem, and concentration. *DSM-IV* at 380-81.

A "somatization disorder" exists in a person who has a medical condition or an effect from medication or drugs when: (1) the symptoms are "in excess of what would be expected;" (2) the "symptoms are not intentionally produced or feigned;" (3) the person has a "history of many physical complaints beginning before age 30 years that occur over a period of several years and result in treatment being sought or significant impairment in social, occupational, or other important areas of functioning;" and (4) the person has complained of all of the following – four pain symptoms, two gastrointestinal symptoms, one sexual symptom, and one pseudoneurological symptom. *Id.* at 490.

Similarly, a "conversion disorder" diagnosis is not made, among other things, where the symptom is limited to pain or the symptom is "intentionally produced or feigned." *See id.* at 498.

referring to those criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) ("DSM-IV").  The record only includes his report of the examination, and there is no indication that Dr. Sacks filled out a Psychiatric Review Technique ("PRT") form that contains the criteria for meeting a Listing of Impairments as defined by the regulations.

As for the relationship between a mental condition and Plaintiff's reported pain, Dr. Sacks was aware that Dr. Whalen was "concerned about" the minimal corroborating findings and that there may be a significant psychological aspect to Plaintiff's pain.  *See Record* at 300.  It is not clear whether he read Dr. Whalen's reports, however.  Dr. Sacks was of the opinion that Plaintiff's "pain is probably exacerbated by his clinical depression."  He opined that Plaintiff might benefit "from either an increase in the Trazodone or a trial of another antidepressant," as well as from an evaluation by the DVR.  *See id.* at 304.

In essence, Dr. Sacks found that Plaintiff's low back pain is due to a "possible" spinal condition and that Plaintiff's depression, in turn, is due to his pain.  Further, the degree of pain Plaintiff experiences is influenced by his depression.  Dr. Sacks also found that because Plaintiff insists that he takes his medications, Stock might not be taking enough or the right kind of medications to alleviate his depression. Dr. Sacks further assessed Plaintiff at "about" a 45 on the Global Assessment of Functioning Scale ("GAF") for the last year.  It is not clear, however, whether that score relates to "serious symptoms" of Plaintiff's dysthymia or whether it relates to "serious social [or] occupational . . . functioning."  *See id.* at 303; *DSM-IV* at 34.

As for Plaintiff's work-related abilities, Dr. Sacks concluded that Plaintiff is capable of: (1) dealing with changes in a workplace situation; (2) being aware of normal hazards, and reacting appropriately; (3) providing his own transportation; (4) understanding and remembering simple as

10

well as more complex instructions; and (5) maintaining the attention required to perform simple repetitive and somewhat more complex tasks. *Record* at 303.

As to limitations on Stock's abilities, the constraints discussed by Dr. Sacks are discussed in detail below in the analysis section.

## II.  Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

## III.  Analysis

After placing the medical evidence of the record in chronological order, it was thoroughly reviewed. Although I do not entirely agree with Plaintiff's arguments, I do agree that remand is required.

ALJ Wurm concluded that because Plaintiff has "some moderate facet and ligament hypertrophy at L4-5 and L5-S1," his "chronic low back pain" is a "'severe' medically determinable impairment." *Record* at 20. He also determined that Plaintiff's "dysthymia" is a

"severe impairment as well." *Id.* However, he found that neither condition satisfied a Listing. *Id.* at 21. Therefore, he moved on to a determination of Plaintiff's residual functional capacity.

As I understand his reasoning, ALJ Wurm concluded that Plaintiff's assertions about pain from his back and migraines was "less than credible" because: (1) there is no objective medical evidence substantiating his claims of back pain; (2) he is able to care for his own personal needs, watch television, and drive his family to work and school; and (3) Dr. Sacks, the only doctor to have commented on Plaintiff's ability to work, indicated that Plaintiff can carry out instructions and maintain the attention required to work . *See id.* at 21-22. Apparently for these same reasons ALJ Wurm further found that Plaintiff's "dysthymia has imposed only a mild degree of limitation with respect to the 'B' criteria functions." *Id.* at 22. The ALJ's analysis as set forth above raises several areas of concern.

First, a lack of objective medical evidence alone is not sufficient grounds for finding that a claimant lacks credibility. *E.g., Hardman v. Barnhart,* 362 F.3d 676, 681 (10th Cir. 2004); 20 C.F.R. § 404.1529(c)(2)("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms . . . solely because the available objective medical evidence does not substantiate your statements."). Likewise, the minimal daily activities performed by Plaintiff do not constitute substantial evidence that he does not suffer disabling pain or that he can work. *E.g., Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir. 1993); *Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir. 1989).

Indeed, "[c]areful consideration must be given to ***any available information*** about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." *Soc. Sec. Ruling 96-8p,* 1996 WL

12

374184 at *5 (emphasis added).  Where, as here, the ALJ finds that the medical evidence establishes a pain-producing impairment that satisfies the "loose nexus" between the impairment and allegations of pain, the ALJ ***must*** consider a number of factors in arriving at his credibility determination.  *See Barnum v. Barnhart,* 2004 WL 1752411 at *4 (10th Cir. 2004) (*quoting* factors outlined in *Hargis v. Sullivan,* 945 F.2d 1482, 2489 (10th Cir. 1991); *see also e.g., Soc. Sec. Ruling 96-7p,* 1996 WL 374186 at *2 ("whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.").  The applicable regulation expressly lists a number of factors for the ALJ to consider in arriving at a credibility determination.  One of those factors to be considered is "[i]ndications of other impairments, ***such as potential mental impairments,*** that could account for the allegations." *Soc. Sec. Ruling 96-7p, supra,* at *7 (emphasis added).[4]

   Thus, the crux of this matter concerns whether Plaintiff's allegations of the chronic nature and degree of pain are intentionally exaggerated or if they are instead caused by a disabling mental condition.  Plaintiff contends, and I agree, that Dr. Whalen's observations are "not the same as a finding that Mr. Stock's complaints are feigned." *Doc. 14* at 2.  Nevertheless, Dr. Whalen raised the possibility that Plaintiff was doing so because he could find no objective medical reason for Plaintiff's symptoms.

   Dr. Whalen's perceived a lack of cooperation by Plaintiff during examinations and noted

---

[4] A regulation cited in one case Plaintiff relies upon has been superceded.  *See Doc. 12* at 9 (citing *Church v. Shalala,* 21 F.3d 1120 (10th Cir. 1994) (unpublished), citing *Soc. Sec. Ruling 88-13*)).

13

the lack of an objective basis to explain Stock's symptoms.  These are two of the criteria for

meeting a psychological diagnosis of "malingering."

> The essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . avoiding work, obtaining financial compensation . . . obtaining drugs. . . .
>
> Malingering should be strongly suspected if any combination of the following is noted:
>
> 1.  Medicolegal contest of presentation . . . .
> 2.  Marked discrepancy between the person's claimed stress or disability and the objective findings
> 3.  Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen
> 4.  The presence of Antisocial Personality Disorder
>
> Malingering differs from Factitious Disorder in that the motivation for the symptom production in Malingering is an external incentive . . . .  Malingering is differentiated from Conversion Disorder and other Somatoform Disorders by the intentional production of symptoms and by the obvious, external incentives associated with it.

*DSM-IV* at 739-40.  Put another way, Dr. Whalen's observations are directly relevant to the

credibility determination ALJ Wurm was required to make.  But rather than reaching an opinion

himself as to whether Plaintiff was malingering, Dr. Whalen wanted others to investigate whether

there was a psychological basis for Plaintiff's allegations.

     In this case, a thorough resolution of the mental impairment issue is critical to the

credibility and residual functional capacity findings.  However, based on the record before me, I

cannot conclude that the record is adequately developed or that the analysis based on the evidence

before the ALJ applied the correct legal standards in this regard.

     First, since Plaintiff went for the psychological help offered by UNM and did not seek help

elsewhere, the only evidence in the record of Plaintiff's mental impairment is Dr. Sacks' opinion. His conclusion that Plaintiff's depression and pain are related does not directly address the issue. Furthermore, Dr. Sacks did not indicate whether he considered the effect of Plaintiff's pain medications on his diagnosis of depression, or whether Plaintiff has a "pain" disorder as defined by the DSM-IV, or whether he even considered that Plaintiff may be "malingering." *See Record* at 498-503, 739. Therefore, his opinion that Plaintiff is not suffering from a somatoform or conversion disorder is not conclusive. Instead, it begs the question since "malingering" is one of the criteria that disqualifies both of those diagnoses.

Also, as noted above, neither Dr. Sacks nor ALJ Wurm or any other person executed a PRT form under 20 C.F.R. § 1520a.

> That regulation provides that when the Administration evaluates the severity of mental impairments, it "must follow a special technique at each level in the administrative review process." *Id.,* § 404.1520a(a). The ALJ must first identify whether there is a need for additional evidence to determine the severity of the alleged mental impairment. Next, he must evaluate the functional consequences of the mental impairment vis-a-vis the claimant's ability to work. Finally, the ALJ must organize and present his findings in "a clear, concise, and consistent manner." *Id.,* §§ 404.1520a(a)(1)-(3). "At the administrative law judge hearing . . . level[], the written decision issued by the administrative law judge . . . must incorporate the pertinent findings and conclusions based on the technique." *Id.,* § 404.1520a(e)(2). This contemplates completion of the PRT form, either with or without the assistance of a medical expert. *Id.,* § 404.1520a(e)(3).

*Burnett v. Barnhart,* CIV 02-1232/KBM (*Doc. 16* at 7-8, filed 11/21/03). In fact, in this Circuit, failure to execute the PRT constitutes error:

> [W]hen a claimant for disability benefits or supplemental security income presents evidence of a mental impairment that allegedly prevents her from working, the ALJ must follow the procedures for evaluating mental impairments set forth in 20 C.F.R. §§ 404.1520a

15

>and 416.920a, including the preparation of a PRT form, which the
>ALJ must attach to his written decision. *See Cruse v. United States
>Dep't of Health & Human Servs.,* 49 F.3d 614, 617 (10th Cir.
>1995); *Andrade v. Secretary of Health & Human Servs.,* 985 F.2d
>1045, 1048-49 (10th Cir. 1993). **The failure to do so is reversible
>error.** *See Hill v. Sullivan,* 924 F.2d 972, 974-5 (10th Cir. 1991).

*Cox v. Apfel,* 198 F.3d 257 (10th Cir. 1999) (unpublished) (emphasis added); *see also Winfrey v. Chater,* 92 F.3d 1017, 1023 (10th Cir. 1996) ("The record must contain substantial competent evidence to support the conclusions reached on the PRT form [and] if the ALJ prepares the form himself, he must discuss in his opinion the evidence he considered in reaching the conclusions expressed on the form.").

Further, even if ALJ Wurm's conclusion about the "B" criteria of Listing 12.04 is sufficient, he nonetheless was required to analyze the impact that Plaintiff's dysthymia has on his residual functional capacity. "The determination of mental RFC is crucial to the evaluation of your capacity to do [work] when your impairment(s) does not meet or equal the criteria of the listings, but is nevertheless severe." 20 C.F.R. Pt. 404, Subpt. P, App. § 12(A). One such area of inquiry is the claimant's ability to "respond[] appropriately to supervision, co-workers, and work pressures in a work setting." 20 C.F.R. § 404.1545(c).

>Ordinarily, RFC is the individual's maximum remaining ability to do
>sustained work activities in an ordinary work setting on a regular
>and continuing basis, and the RFC assessment must include a
>discussion of the individual's abilities on that basis. A "regular and
>continuing basis" means 8 hours a day, for 5 days a week, or an
>equivalent work schedule.

*Soc. Sec. Ruling 96-8p, supra,* at *2.

In his discussion of Plaintiff's work-related abilities, Dr. Sacks appears to have identified two that are work-related limitations. That is, Plaintiff "could relate with other workers,

16

supervisors, and the public ***with consideration for his pain*** involvement" and, because of the pain, Plaintiff "would have ***difficulty withstanding the stress and pressures associated with many day-to-day work activities of a moderate-to-severe level*** because of his pain." *Record* at 303, 304 (emphasis added).

ALJ Wurm's characterization of these limitations as "avoiding stress" do not accurately reflect the substance of these findings. Indeed, when the vocational expert was given ALJ Wurm's hypothetical that included avoiding stress, she identified jobs Plaintiff could perform. But when she was specifically questioned about the second limitation, as well as the low GAF assessment, she testified that Plaintiff would not be able to maintain employment "over the long haul." *Record* at 79, 80. ALJ Wurm did not discuss why he rejected these aspects of Dr. Sacks' findings, nor could he have done so based solely on his conclusion that Plaintiff was not credible. *C.f., Valdez v. Barnhart,* 62 Fed. Appx. 838, 842, 843 (10th Cir. 2003).

Finally, Plaintiff asserts that Dr. Whalen "diagnosed" Plaintiff with myofacial pain syndrome or fibromyalgia, and that this diagnosis "helps to explain the minimal objective findings." *See Doc. 12* at 8; *see also Record* at 267, 291. Dr. Whalen, however, listed the condition as an "impression," and no other doctor diagnosed Plaintiff with and treated him for fibromyalgia. Even if this can be considered a diagnosis, it did not change Dr. Whalen's opinion that there appears to be a lack of functional impairment due to Plaintiff's condition and that there is a substantial emotional component to Plaintiff's allegations of pain.[5] Nevertheless, in light of

---

[5] *See Komar v. Apfel,* 134 F.3d 382 (10th Cir. 1998) (unpublished) ("While some physicians have diagnosed fibromyalgia, others have questioned whether her physical symptoms are consistent with that diagnosis. . . . Objective evidence shows that Ms. Komar has a normal range of motion, although at least one time she resisted the range of motion tests in what the physician considered to be an apparent attempt to show herself as having less physical capacity than she actually had. She takes no medication aside from

the other reasons for remand, the ALJ should explore this possible condition as well.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 11)* is GRANTED and the matter is remanded to the Commissioner for further proceedings.  A final order will enter concurrently herewith.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

---

using Valium at night.  She also showed improvement in her physical abilities when she attended occupational rehabilitation.  She was discharged from that program when she stopped attending.").